UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALVIN ROSS,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>D. LATRAILLE, et al.,<br><br>　　　　Defendants | Case No. 1:08 cv 01886 GSA PC<br><br>ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(ECF NO. 41) |

　　　　Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).[1] Pending before the Court is Defendant Callow's motion for summary judgment. Plaintiff has opposed the motion.[2]

**I.　　Procedural History**

　　　　This action proceeds on the November 19, 2009, first amended complaint. Plaintiff, currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) at CSP Solano, brings this action against defendant correctional officials employed by the CDCR at CSP Corcoran. Plaintiff names the following individual defendants: Lieutenant J. Callow and Sergeant Latraille. On March 25, 2011, an order was entered, finding that the first amended

---

[1] Plaintiff filed a consent to proceed before a magistrate judge on December 7, 2008 (ECF No. 5). Defendants filed their consent to proceed before a magistrate judge on June 30, 2011 (ECF No. 21).
[2] Defendants' motion for summary judgment was filed on April 12, 2012. On July 10, 2012, the Court issued and re-served Plaintiff with the summary judgment notice required by Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988)(ECF No. 58.) The order was re-served in response to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012).

1

complaint stated a claim for relief against Defendant Callow for retaliation in violation of the First Amendment and against Defendant Latraille for a state law claim of assault. Both Defendants have filed the motion for summary judgment that is before the Court. Plaintiff has opposed the motion. Defendants filed a reply.

## II.     Allegations

The events at issue occurred while Plaintiff was housed at CSP Corcoran. On November 8, 2007, while Plaintiff was working in the Program Office making a phone call, Sgt. Latraille entered the office and asked Plaintiff what he was doing and who he was talking to, remarking in a negative tone that it seemed Plaintiff had been on the phone for a long time. Plaintiff responded that he was "getting the cell searches" and had an officer on the phone, then asked Sgt. Latraille if he wanted to check on him, extending his left arm and offering the phone to Sgt. Latraille. Sgt. Latraille struck Plaintiff's left hand, nearly knocking the phone out of his hand, stating, "I don't need to see who's on the phone." One of Plaintiff's fingers was cut, causing minor bleeding. No medical report was made. Plaintiff reported the assault by Sgt. Latraille to the supervisor, Lt. Callow, who said he would interview Sgt. Latraille.

On November 11, 2007, Lt. Callow called Plaintiff into his office. Sgt. Latraille was present and explained that on November 8, 2007, he thought Plaintiff had been talking on the phone too long, in a relaxed manner, and when Plaintiff stretched out his arm with the phone, Sgt. Latraille swung his arm to hit.[3] Plaintiff responded that if he had hit Sgt. Latraille, he would have been punished for staff assault and placed in administrative segregation, suggesting that Sgt. Latraille should be disciplined. Plaintiff agreed to drop the matter if Sgt. Latraille did not retaliate against him.

On November 12, 2007, Plaintiff entered the work exchange area for work. Correctional Officer (C/O) Leal came to pick Plaintiff up and told him he had specific instructions from the

---

[3] Plaintiff's facts in the First Amended Complaint do not specify what Sgt. Latraille meant to hit. (Am. Compl. at p. 11  - pagination is from the Court's electronic filing system).

Sergeants not to allow Plaintiff to bring anything with him, such as legal documents, anymore. When Plaintiff arrived at the Program Office complex, he observed some of the Sergeants looking at him distastefully. Plaintiff went to Lt. Callow and asked him what was going on. Lt. Callow said he would look into it and get back to Plaintiff. Lt. Callow then proceeded to the lunch room where the Sergeants were gathered.

On November 13, 2007, Control Booth Officer A. Hernandez summoned Plaintiff and told him he had received a phone call stating, "If Ross tries to come to work or call, tell him we will call him when we need him," indicating that Plaintiff was not going back to the work area anymore. That evening, Plaintiff was called to Lt. Kavanaugh's office for a videotaping of Plaintiff's injuries from the assault. Plaintiff discovered that an investigation was being conducted. Lt. Callow assured him he would not be terminated from his job because he did nothing wrong, and he would continue to be paid during the investigation. Lt. Kavanaugh conducted an on-camera interview with Plaintiff, who demonstrated the assault and showed the injury to his finger, which had nearly healed and was difficult to see on camera.

On December 18, 2007, Plaintiff was questioned about the assault by C/Os Sanchez and Espinoza, who asked Plaintiff what he wanted to happen. Plaintiff said Sgt. Latraille should be disciplined for the assault, and Plaintiff should be allowed to go back to work.

On February 13, 2008, Plaintiff asked Sgt. Pear if the investigation was over and when he could return to work. Sgt. Pear said the investigation had concluded a while ago and Plaintiff should have already returned to work. Plaintiff had not received any documentation.

On February 16, 2008, Plaintiff asked C/O B. Kennedy, who was in charge of Plaintiff's time card, why Plaintiff has not been called back to work. C/O Kennedy said it was Lt. Callow's decision not to bring Plaintiff back to work, and there was no justifiable reason, as Sgt. Latraille was not there anymore. C/O Kennedy also said he could not continue to pay Plaintiff if he was not working, despite what Lt. Callow said. Plaintiff realized that Lt. Callow had retaliated against him by permanently terminating his job assignment, solely because Plaintiff had filed a grievance against Sgt. Latraille, who was Callow's staff member.

### III. Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denial of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes on 1963 amendments).

4

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985)(aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is not 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## IV.   Retaliation

Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a 1983 claim. Rizzo v. Dawson, 778 F.2d 5527, 532 (9th Cir. 1985); see also Valandingham v. Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005); accord Watison v. Carter, 668 F.3d 1108, 1114-15 (9th Cir. 2012); Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).

An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support a claim under section 1983. Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003). The Court must "'afford appropriate deference and flexibility' to prison officials

5

in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995)(quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  The burden is on Plaintiff to demonstrate "that there were no legitimate correctional purposes motivating the actions he complains of." Pratt, 65 F.3d at 808.

Defendant Callow supports his motion with his declaration. Regarding Plaintiff's allegations, Lt. Callow declares the following:

> In November 2007, I was the 3rd Watch Facility A Lieutenant.  3rd watch is from 2:00 p.m. to 10:00 p.m. One inmate with whom I am familiar is inmate Alvin R. Ross, who was assigned as the 4A Facility Lieutenant's clerk, Job # CLCK5.301.  I supervised Ross from August 6, 2007 until November 8, 2007.
>
> As the Facility 4A Lieutenant, I was responsible for the supervision of correctional sergeants who, in turn, directly supervise correctional officers.  I was responsible for planning and supervising the feeding, clothing, housing, transportation, custody and discipline of the inmates in Facility 4A.  Facility 4A houses Level IV inmates.  Level IV inmates are the inmates who pose the most risk to the safety of the institution.
>
> On November 8, 2007, during 3rd watch, I was working in my office in the 4A program office with my office door wide open.  I was approached by Inmate Ross, who stated that he had just been assaulted by one of my sergeants, Sergeant Latraille, while Ross was on the telephone on the 4A program clerk's office.  The 4A program clerk's office is right across the hallway from my office and I made the clerks keep their office door wide open.  Prior to Ross coming into my office, I did not hear any voices, arguments or any sound of a scuffle coming from the 4A program clerk's office.
>
> After Ross finished explaining what happened, I called Sergeant Boyer who came into my office.  I had Ross explain what had happened to Sgt. Boyer.
>
> After Ross finished explaining to Sgt. Boyer what happened, I had Ross go back to his office.  I called the Watch Commander, Lieutenant Chacon, to discuss the situation.  Next, I had Ross come into my office and together, Lt. Chacon and I both asked Ross to repeat the event again so that Lt. Chacon could hear the story first hand.  It was apparent that Ross felt like he had been wronged in some manner, but Ross was "cool" with me talking to Latraille and that he would be content with that action.
>
> At no time on November 8, 2007 during my conversation with Ross alone, with Sgt. Boyer or with Lt. Chacon did I see any

6

visible injuries anywhere on Ross. At no time did Ross ever say to me, Sgt. Boyer or Lt. Chacon that he sustained any injuries as a result of the incident with Latraille. It is an inmate's responsibility to immediately report any injury to his supervisor so that prompt medical attention can be given if needed and for the supervisor's information and initiation of necessary reports.

Later that night, Lt. Chacon and I talked to Latraille about the incident. Latraille explained that when Ross thrust the phone towards his face, he reacted by nudging or batting the phone with the back of his left hand in order to get the phone out of his face. Latraille made contact with the phone only and not with Ross. Latraille also stated that he did not perceive this to be an incident that would require documentation or notification to his supervisor.

On November 11, 2007, I had a meeting with Latraille and Ross. After this meeting was concluded, Ross gave me a memorandum which was a written report of the incident between him and Latraille.

Because of the nature of Ross' allegations and the fact that he had given me a written memorandum regarding the incident, I felt that for the best interest of all parties involved, the matter should be investigated thoroughly. Thus, on November 13, 2007, I notified R. Flores, Investigative Services Unit (ISU) Captain that I was requesting ISU to conduct a full investigation into Ross' allegations. I also notified Captain R. Davis, my supervisor, of my decision to have ISU conduct an investigation.

Because I turned the matter over to ISU on November 13, 2007, I decided to temporarily remove Ross from his assignment as 4A Facility Lieutenant's clerk. The reason why I chose to temporarily remove Ross from his assignment was not in retaliation for making an allegation that he had been assaulted by Latraille or for giving me the written memorandum, but because I felt that Ross' presence in the 4A program office would jeopardize the integrity of ISU's investigation. Moreover, I felt that having Ross continue working on the 4A program office with Latraille would disrupt the orderly operation of the 4A program office and could pose a safety and security risk to all parties involved and the institution.

While I was authorized to place Ross immediately into Administrative Segregation for his own protection on November 8, 2007, I chose to only temporarily remove Ross from his assignment because I felt that the matter had been a misunderstanding and I was trying to handle the matter at the lowest level possible.

On December 18, 2007, ISU completed its investigation and found that Ross's allegations were unsubstantiated and that Latraille did not violate CDCR policy.

On December 19, 2007, I completed a CDC-128B "Informational Chrono" which was given to Ross. Attached here to as Exhibit "A"

7

is a true and correct copy of the "Informational Chrono" which I completed on December 19, 2007. This record was made and kept in the ordinary course of my employment with the CDCR. The purpose of the chrono was to inform Ross that he was being unassigned from his current position. I made the decision to remove Ross from his current position because he had shown a propensity for making allegations of staff misconduct, all of which had proven to be false. Additionally, staff assigned to 4A facility third watch had lost their confidence in Ross. I felt that it was in the best interest of Ross himself, of the institution and of the safe, efficient and orderly operations of Facility 4A that Ross be reassigned.

Ross has every right to make allegations of staff misconduct and my determination to unassign him was not out of retaliation for making such allegations. In fact, I requested that Ross be reassigned to any position not on Facility 4A. I requested that he be reassigned because, after making the allegations against Latraille, which had been unsubstantiated and proven false, Ross's continued presence on Facility 4A would disrupt the work environment in the program office and would disrupt the orderly operations in Facility 4A.

The December 19, 2007, chrono which was given to Ross was also submitted to Ross's correctional counselor. Per policy, the counselor refers the request to the classification committee for consideration and action. Thus, once Ross was unassigned from his Facility 44A clerk's position, it was up to the classification committee to take action on my request for Ross to be reassigned to any position not on Facility 4A. I played no role whatsoever, if, or when, Ross was reassigned.

(Calloway Decl. ¶¶ 3-17.)

The Court finds that Defendant Callow has met his burden on summary judgment. Lt. Callow's declaration establishes that he temporarily removed Plaintiff from his assignment because he felt that Plaintiff's presence in the program office would jeopardize the integrity of the ISU's investigation. Lt. Callow's declaration establishes that the investigation was initiated in response to Plaintiff's accusation regarding Sgt. Latraille. Lt. Callow declares that having Ross continue working in the program office with Latraille would disrupt the orderly operation of the program office and could pose a safety and security risk.

Exhibit A to Lt. Callow's declaration is a true and correct copy of CDC Form 128B, and informational chrono, which was given to Plaintiff. The purpose of the chrono was to inform

8

Plaintiff that the decision to remove him from his current position was made because Plaintiff had shown a propensity for making allegations of staff misconduct, all of which had proven to be false. This exhibit establishes that the decision was also based on the fact that staff assigned to 4A facility had lost confidence in Plaintiff. Lt. Calloway declared that it was in the best interest of Plaintiff himself, and the institution and of the safe, efficient and orderly operation of Facility 4A that Plaintiff be reassigned.

Lt. Callow's declaration also establishes that he requested that Plaintiff be reassigned to any position not on Facility 4A. Lt. Callow declares that he did so because, after making the allegations against Sgt. Latraille which had proven to be false, Plaintiff's continued presence on Facility 4A would disrupt the work environment in the program office and would disrupt the orderly operations in Facility 4A. Further, Lt. Callow's declaration establishes that while he requested that Plaintiff be reassigned to another position, he played no role in deciding if or when Plaintiff was reassigned.

Defendant Callow correctly argues that courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory.'" Pratt, 65 F.3d at 807 (quoting Sandin, 515 U.S. at 482). It is undisputed that institutional order, discipline, safety and security are legitimate penological goals. See Turner v. Safley, 482 U.S. 78, 91 (1987); Procunier v. Martinez, 416 U.S. 413 (1974); Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995).

In his statement of undisputed facts Plaintiff offers a fact by fact rebuttal of Defendant's statement of undisputed facts, admitting or denying them, and referring the Court to specific evidence. Defendants' undisputed facts number 61 and 62 are that Callow decided to temporarily remove Plaintiff from his assignment as 4A Facility Lieutenant's Clerk because Lt. Callow felt that Plaintiff's presence in the 4A program office would jeopardize the integrity of the ISU's investigation. Undisputed fact number 63 indicates that Plaintiff admitted the he would probably be temporarily removed from his job if his presence would compromise the investigation.

Plaintiff refers the Court to his declaration, his deposition, and the declaration of Lt. Callow to establish that he "was permanently removed from his job assignment, not temporarily." Plaintiff's reference to Lt. Callow's declaration establishes that Callow removed Plaintiff from his position because he had shown a propensity for making false allegations against staff and because staff assigned to 4A facility third watch had lost confidence in Plaintiff. (Callow Dec. 4:9-14.) Plaintiff's reference to his own declaration establishes that "I presented a documented report to Defendant Callow concerning the incident of November 8, 2007, on November 11, 2007, detailing what took place with Latraille and myself. As a result, I was subsequently terminated from my job in what I view to be retaliatory action against me in assistance to Latraille." (Pltf.'s Decl. ¶ 15.) Plaintiff also submits his declaration to establish that he never attended a Unit Classification Hearing to be unassigned, and that Callow "advised Plaintiff that he was not taking the side of an inmate over an officer, and therefore supported Latraille by firing me." (Id. ¶¶ 17, 18.) Plaintiff also refers to his deposition transcript (67:3-5, 70:17-19, 73:1-4). The deposition establishes that Plaintiff believed his termination to be retaliatory, but fails to establish any evidence to support such a conclusion.

In his memorandum of points and authorities, Plaintiff refers to Lt. Callow's statement that he removed Plaintiff from his job, in part, because he had a propensity for making false allegations against staff. Plaintiff argues that "this statement clearly demonstrates, by self-admission a retaliatory action, 1st Amendment violation." Plaintiff also refers to Lt. Callow's statement that Plaintiff's continued presence in the 4A Program Office would disrupt orderly operations and could pose a safety risk. Plaintiff argues that Defendant Latraille was not a regular sergeant, but was the relief sergeant on the date in issue. Plaintiff also argues that "Defendant Callow admitted that it was apparent to him that Plaintiff was wronged in some manner . . . therefore knowing that Plaintiff did not have a propensity for making untrue allegations of staff misconduct." Plaintiff refers to paragraph 7 of Lt. Callow's declaration. Lt. Callow's paragraph 7 establishes Lt. Callow wanted to hear Plaintiff's side of the story. Lt.

Callow declared that, in his view, "it was apparent that Ross felt like he had been wronged in some manner."

Plaintiff does not, however, come forward with any evidence that Lt. Callow removed Plaintiff from his job in retaliation for exercising first amendment activity. Plaintiff concludes that because Lt. Callow felt that "it was apparent that Ross felt like he had been wronged" and then later believed Latraille's account, that Lt. Callow retaliated against him. This does not, however, establish evidence that Lt. Callow retaliated against Plaintiff. The undisputed facts are that Plaintiff accused Sgt. Latraille of misconduct, Lt. Callow heard Plaintiff's side of the story, initiated an investigation, and temporarily removed Plaintiff from his job because of the investigation. That Plaintiff infers a retaliatory motive to Lt. Callow does not establish evidence that Lt. Callow retaliated against Plaintiff. Further, Plaintiff's belief that the permanent loss of his job was in retaliation for making a complaint against Sgt. Latraille is unsupported by evidence. Lt. Callow's declaration establishes that Plaintiff was removed, among other reasons, because staff had lost confidence in Plaintiff. Lt. Callow's declaration also establishes that Plaintiff be reassigned to any position not on Facility 4A. Plaintiff's subjective belief that Lt. Callow removed Plaintiff from his job in retaliation for complaining about Sgt. Latraille is unsupported by any evidence. Judgment should therefore be entered in favor of Lt. Callow.[4]

## V. State Law Claims

Under 28 U.S.C. § 1367(c)(3), the Court has discretion to dismiss state law claims when it has dismissed all of Plaintiff's federal claims. "In the unusual case in which federal law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S.

---

[4] Further, prisoners have no constitutional right to a prison job. See Baumann v. Arizona Dep't of Corrections, 754 F.2d 841, 846 (9th Cir. 1985)(no constitutional right to jobs and educational opportunities); Rizzo v. Dawson, 778 F.2d 527, 530 (9th Cir. 1985)(no liberty or property interest in vocational training); Hoptowit v. Rhay, 682 F.2d 1237, 1254-55 99th Cir. 1982)(no constitutional right to rehabilitation; Lyon v. Farrier, 727 F.2d 766, 769 (8th Cir.)(no constitutional right to prison job) cert. denied 469 U.S. 839 (1984. See also James v. Quinlan, 866 F.2d 627, 630 (3rd Cir.)(no liberty interest in UNICOR job assignments), cert. denied 493 U.S. 870(1989).

11

343, 350 n. 7 (1988); Schneider v. TRW, Inc., 983 F. 2d 986, 993 (9th Cir. 1991).  Some circuits have held that a court may retain jurisdiction over state law claims if extraordinary or unusual circumstances justify their retention.  See, e.g., Musson Theatrical Inc. v. Federal Express Corp., 89 F.3d 1244, 1255 (9th Cir. 1996); Wentzka v. Gellman, 991 F.2d 423, 425 (7th Cir. 1993).   The Court finds that extraordinary or unusual circumstances are not present.  The Court therefore declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

## VI.   Conclusion and Order

The Court finds that Defendant Callow has come forward with evidence that establishes the lack of existence of a triable issue of fact.  Lt Callow's evidence establishes that he removed Plaintiff from his position for legitimate penological interests.  The evidence establishes that Lt. Callow made efforts to get Plaintiff a position in another facility.  Although Plaintiff argues that the same evidence establishes that Lt. Callow removed Plaintiff from his job in retaliation for making allegations against staff, this subjective impression is unsupported by any evidence.

Accordingly, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is granted.  Judgment is entered in favor of Defendants and against Plaintiff.  The Clerk is directed to close this case.

IT IS SO ORDERED.

Dated:   **September 2, 2014**

**/s/ Gary S. Austin**

UNITED STATES MAGISTRATE JUDGE